

**SIGNED this 12th day of November, 2021**

_Shelley D. Rucker_
Shelley D. Rucker
CHIEF UNITED STATES BANKRUPTCY JUDGE

_____

### IN THE UNITED STATES BANKRUPTCY COURT FOR
### THE EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **K3D Property Services, LLC,** | ) | **No. 1:19-bk-15361-SDR** |
| | ) | **Chapter 11** |
| | ) | |
| **Debtor.** | ) | |

### <u>MEMORANDUM OPINION</u>

The Debtor, K3D, is a painting contractor that has been through a significant restructuring of its business since it filed for bankruptcy in December of 2019. A more focused company has emerged, leaving behind an unprofitable home construction and remodeling business. It has found new revenue streams which take advantage of the needs created by the pandemic of 2020. Those new business lines apply the Debtor's experience in painting contracting to restocking and renovating commercial retail spaces. The Debtor has proposed an Amended Plan that restructures its debt, provides an estimated dividend of 20% to unsecured

1

creditors, and projects a growing business that should not require further financial restructuring. It has overwhelming creditor support based on the voting. The issue before the court is whether that plan can be confirmed over two objections to a plan provision that temporarily enjoins collection actions against third parties.

The objections focus on a provision in the plan which protects the owners of the Debtor and their spouses during a four-year period. The owners want this time without litigation expenses and distractions to come up with personal funds that provide a portion of the proposed distribution to unsecured creditors. Approving a plan with such protections requires this court to adopt a different test for the appropriateness of a *temporary* post-confirmation, third-party injunction than the test used by the Sixth Circuit for the appropriateness of a *permanent* injunction. *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)*, 280 F. 3d 648 (6th Cir. 2001). The Debtor advocates that this court apply the test for approval of a temporary post-confirmation injunction suggested in *Feld v. Zale Corporation (In re Zale)*, 62 F.3d 746, 765 (5th Cir. 1995). For the reasons given below, the court finds that the appropriate test remains the *Dow Corning* test, even where the injunction is temporary. Therefore, the court concludes that the temporary third-party injunction in the plan is not appropriate where the Debtor cannot show that it meets the *Dow Corning* factors. As such, the court cannot confirm a plan containing the proposed provision. For the reasons stated below, the court will deny confirmation of the Amended Plan. The Debtor may be able to amend its plan in such a way as to meet those factors and obtain confirmation, so the court will take no additional action.

## I.    Jurisdiction

The court has jurisdiction to determine the issues before it under 28 U.S.C. § 1334(b) and § 157(b)(2)(L) (confirmations of plans) and (O) (adjustment of debtor and creditor relationships).

As for imposition of an injunction on creditors which prevents them from pursuing their claims against non-debtors, the court has jurisdiction to grant such an injunction provided the injunction is otherwise appropriate. *See Dow Corning*, 280 F.3d at 656.

> The Bankruptcy Code does not explicitly prohibit or authorize a bankruptcy court to enjoin a non-consenting creditor's claims against a non-debtor to facilitate a reorganization plan. *In re Continental Airlines*, 203 F.3d 203, 211 (3d Cir. 2000). However, bankruptcy courts, 'as courts of equity, have broad authority to modify creditor-debtor relationships.' *United States v. Energy Resources Co.*, 495 U.S. 545, 549, 109 L. Ed. 2d 580, 110 S. Ct. 2139 (1990). For example, § 105 (a) of the Bankruptcy Code grants a bankruptcy court the broad authority to issue 'any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.' 11 U.S.C. § 105(a). […] Consistent with section 105(a)'s broad grant of authority, the Code allows bankruptcy courts considerable discretion to approve plans of reorganization. *Energy Resources Co.*, 495 U.S. at 549.

*Dow Corning*, 280 F.3d at 656.

## II.   Findings of Fact

### A.  Disclosure Statement and Plan

K3D Property Services, LLC is the Debtor in this case. On December 23, 2019, it filed a voluntary petition for chapter 11 relief. The plan and disclosure statement were filed on February 26, 2021. (Docket No. 346 & 347). The court held a hearing April 15, 2021, on objections that were filed to that disclosure statement. At the hearing, the Debtor announced that it would make changes to the disclosure statement to address the objections and amend the plan. The court approved the disclosure statement on April 16, 2021, contingent on the Debtor's making those amendments. The Debtor did file the Amended Disclosure Statement (Docket No. 370) and the Amended Plan (Docket No. 371) on April 22, 2021.  The Amended Disclosure Statement and the Amended Plan were sent to the creditors for voting. (Docket No. 376, 387, and 388).

Prior to the confirmation hearing, the Debtor noticed an inconsistency between the Amended Disclosure Statement and the Amended Plan in the treatment of the Unsecured Creditors (Class 8) and filed a Motion to Amend. (Docket No. 405). The court granted the Motion to Amend (Docket No. 418), and the Debtor renoticed the Class 8 members to clear up any confusion about their distribution. The creditors were also provided with an opportunity to change their votes. The Debtor sent appropriate notice of the Amended Disclosure Statement, the Amended Plan, and the deadline to accept or object to all creditors. With respect to the temporary third-party injunction, the Debtor also sent supplemental notice to those parties being enjoined that were not listed in the original matrix. (Hr'g. Digit. Audio, July 20, 2021, at 10:20:07-10:23:39). This solicitation complied with the requirements under 11 U.S.C. § 1123. No party objected to notice or the method of solicitation.

### B.  Contents of the Plan

Brothers Kenneth (Ken) and Kurtis (Kurt) Morris operated several businesses, including Morris Holdings, LLC; Scenic City Investments, LLC; Plato's Closet; Style Encore; and the Debtor and all of its divisions. They formed the Debtor in 2013 and acquired a license to use the Painter Ready name. In 2015, the Debtor started its Builder Ready division. (Disclosure Statement, Docket No. 370 at 3). The Debtor is owned by the Morris brothers, 50% each.

The petition lists twelve different trade names for the Debtor's businesses, but the most active businesses were home construction and painting. The Builder Ready operation was very unprofitable and was closed with the filing of the case. The Debtor focused on its painting business, Painter Ready. When the pandemic hit, only a couple of months after the case was filed, Ken Morris developed a new line of business, restocking shelves and remodeling for businesses who were adapting to new customer safety requirements.

The Amended Plan provides for the continued operations of the Debtor under the supervision of the Morris brothers. From the operations, the Debtor will make payments to its secured creditors equal to the value of their secured claims. It will also make periodic payments to unsecured creditors. Those payments, plus a contribution from the Morris brothers, should provide a dividend of approximately 20% on their unsecured claims. The liquidation analysis included in the Disclosure Statement showed that the recovery to unsecured creditors in the event of a liquidation would be zero. (Disclosure Statement, Docket No. 370 at 25). All of the testimony at the confirmation hearing supported a finding that a liquidation would provide no recovery for unsecured creditors.

The Morris brothers are proposing to make two contributions to retain their equity interests. One contribution of $100,000 will be made in the first month following confirmation of the plan. It will primarily be used for administrative expenses and operations. A second contribution of another $100,000 will be made in the forty-fourth month and it will be used to pay unsecured creditors. (Amended Plan, Docket No. 371 at 13). The Debtor argues in its brief that the Morrises will retain equity worth only $166,540 for their $200,000 contribution. (Memorandum, Docket No. 419 at 32; Trial Exhibit R, Docket No. 438-1 at 228). This value was not challenged at the confirmation hearing. In fact, it was not even discussed because the Debtor had the votes of the impaired classes and did not have to conduct an auction of its equity to meet the absolute priority rule.

### C.  Original Release and Injunction

Article 10 of the Plan contains the problematic provision. Article 10, as originally proposed, provided complete releases to the professionals, directors, and officers for any of their actions during the case, whether those actions were grossly negligent or even fraudulent. The

injunction provided that the confirmation order would temporarily restrain any creditor, party-in-interest, or any third party from pursuing any officer, director, shareholder, managing person, guarantor, or co-borrower of the Debtor for collection of their claims. It specifically protected the Morris brothers and their wives as long as they retained their equity in the Debtor or remained in the Debtor's employment. The injunction terminated upon conclusion of payment to the unsecured creditors, which would be six years after the effective date of the plan. (Amended Plan, Docket No. 371 at 11). The consideration given to obtain the protection of the injunction is the $200,000 equity contribution mentioned above. The initial $100,000 is currently available, and the second $100,000 will be funded from the Morris brothers' salaries. The Morris wives are not contributing anything for their protection against suits, unless the contribution required in month 44 needs to come from assets in their names or jointly with their spouses. However, there was no evidence that any such assets had been identified to be contributed on their behalf. The Morris brothers testified that they are committed to spending the next four years making this plan work and that this amount is the best that they can do.

There were numerous problems with the original injunction. It included a provision that the statute of limitations was *not* tolled with respect to the actions enjoined during the term of the injunction. Parties who denied even being creditors of the Debtor and creditors who had never been scheduled as creditors were enjoined. The provision even allowed the Debtor to determine if there were others that it might deem "potentially" to be a creditor and thereby subject that party to the injunction. Ken Morris was concerned that other parties might try to sue him, even if he believed the debt was rightfully the Debtor's. Due to the large number of entities through which the Morrises had operated their construction services and real estate businesses, who was actually the party that owed the debt had been an issue in several matters and adversary

6

proceedings filed prior to confirmation. This catch-all provision for potential creditors was included by the Debtor to address the risk that there might be other parties whom the Morrises would consider creditors of the Debtor but who might seek to recover against the members personally or against other entities which the members owned.

The Debtor substantially altered Article 10 at the confirmation hearing. The release was changed to an exculpation only for negligence.

The injunction was also narrowed. The original injunction could have prevented Truist from pursuing PCNooga, LLC d/b/a Plato's Closet and SENooga, LLC, d/b/a Style Encore, two other companies operated by the Morrises which are in the retail clothing business and had guaranteed the Truist obligations. Truist and the Debtor stipulated at the confirmation hearing that the entities were not injunction beneficiaries.  The catch-all provision applying the injunction to "[a]ny lawsuit or enforcement action where an entity or person is seeking compensation from any injunction beneficiary for a debt potentially owed by the Debtor" was deleted. (Amended Plan, Docket No. 371 at 22). Settlements were reached with other enjoined parties who had previously contended they were creditors of other Morris entities. The duration of the injunction was shortened to four years. Applicable statutes of limitation were tolled during the injunction. The discretion left to the Debtor in the original version of the injunction gave rise to issues of due process and good faith and was a violation of Fed. R. Bankr. P. 3016(c)'s requirement that enjoined parties be identified. However, that is no longer the version the court is called upon to consider.

### D.  Final Version of Temporary Injunction

The final version of the injunction was filed as a post-hearing exhibit. (Docket No. 459). The injunction reads as follows:

7

<u>10.05(C) Temporary Post-Confirmation Injunction Protecting Officers, Directors, Members and their Assets, Equity Holders in the Reorganized Debtor, Guarantors and Co-Borrowers that Contribute Monies to the Plan.</u>

For 48 months following the effective date of the Plan, the Confirmation Order shall temporarily restrain any creditor, party-in-interest or any third party from pursuing any officer, director, shareholder, managing person, guarantor, or co-borrower of the Debtor for collection of all or any portion of their Claims or any claim that could have or should have been brought against the Debtor. The temporary injunction shall restrain claims against Kenneth and Denia Morris (husband and wife) and Kurtis and Kyle M. Morris (husband and wife), (collectively the "injunction beneficiaries") but only if the injunction beneficiaries retain their equity in Reorganized Debtor) and for as long as the Ken and/or Kurtis Morris remain with the Debtor. If Ken Morris or Kurtis Morris leaves K3D's employ during the plan payment term, then as to the person leaving, the injunction terminates upon his (or their) departure from employment with K3D.

Claims included within the injunction are those that arose prepetition or that arise up through the Effective Date. The injunction shall terminate at the end of the 48th month following the effective date of the Plan or at such other time as the Court, in the Confirmation Order, may direct.

The injunction shall apply to any lawsuit brought against any of the injunction beneficiaries including, but not limited to the following actions or persons and shall act to stay any such lawsuit, action and/or efforts to enforce any judgment against any injunction beneficiary:

1. Thomas Shayne Rollins and Katerina Rolls[sic] vs. Scenic City Investments, LLC and Ken Morris, individually, Case no. 10 C 1432, in the Circuit Court of Hamilton County, Tenn. The Rollins have covenanted to be bound by the proposed temporary injunction. The order confirming the plan shall provide that the Rollins hold an allowed unsecured claim in the amount of $70,000.

2. Jacobs and Baughman vs. Scenic City Investments, Hemlock Homes, LLC and Kenneth Morris, individually, Case no. 20-0213, in the Chancery Court of Hamilton County, Tenn. Jacobs and Baughman, through counsel at the confirmation hearing, affirmatively represented that they too had covenanted to be bound by the proposed temporary injunction. The order confirming the plan shall provide that Jacobs and Baughman hold an allowed unsecured claim in the amount of $50,000.

3. Acme Brick Tile & Stone, LLC vs. Kenneth Morris, Case no. 20 GS 746, Court of General Sessions, County of Hamilton, Tenn.

4. Lee Paint Center vs. Kenneth Morris, individually, and d/b/a Painter Ready of Chattanooga, Case no. 20 GS 1675, Court of General Sessions, County of Hamilton, Tenn.

5. FORA Financial Advance vs. K3D, Kurtis Morris and Kenneth Morris, Index no. 615 772/2019, Supreme Court of the State of New York, County of Nassau.

6. Ferguson Enterprises v. K3D Properties d/b/a Builder Ready & Ken Morris, Case no. 20GC1789, General Sessions Court of Davidson County.

7. Pearson v. Ken Morris, Kurt Morris, Scenic City Investments and Morris Holdings, Case no. 21 GS 611, Court of General; Sessions, County of Hamilton, Tenn. The Pearsons, through counsel after the confirmation hearing, affirmatively represented that they too had covenanted to be bound by the proposed temporary injunction. The order confirming the plan shall provide that the Pearsons hold an allowed unsecured claim in the amount of $25,000.

8. Swift Financial, LLC v K3D Property Services, LLC /d/b/a Builder Ready and Kurtis Morris, Arbitration.

9. [Intentionally left blank.]

10. Yorshire Properties v. Kenneth Morris, in the Chancery Court for Hamilton County, TN, Docket no. 20-0397.

Should the Debtor be in violation of the Plan's payment terms and if that violation remains uncured for a period of 30 days after receipt by the Debtor of written notice from any party directly affected by such violation, the affected party may apply to this Court to dissolve the temporary injunction but only as to the affected party. As the issuing court, the Bankruptcy Court shall have exclusive jurisdiction to extinguish or modify the temporary injunction. The Debtor retains the right to file a motion to continue or to reinstate the temporary injunction.

The injunction is not a discharge or release. To the extent they have liability, the injunction beneficiaries shall not be discharged or released from any liability for any claim and debt. The injunction does not discharge or release a third party's liabilities. While the injunction operates, any applicable statute of limitations shall be tolled to preserve any claim or cause of action.

The injunction applies to the individual person and entity and also to their assets both real property and personal property.

9

(Revised Article 10 of the Proposed Plan, Docket No. 459 at 4-6).

### E.  Necessity of the Injunction to Reorganization

At the hearing on July 19, 2021, the Debtor proffered that Ken and Kurt Morris were essential to a successful reorganization. The undisputed proffer demonstrated that Ken and Kurt have years of experience operating businesses, including during K3D's chapter 11 reorganization. In addition, Ken Morris is a CPA, and Kurt Morris has significant real estate and construction experience. The testimony also indicates that K3D will compensate the Morrises approximately $39,000 each annually for their continued work as the officers of K3D. (Hr'g. Digit. Audio, July 19, 2021, at 11:07:00; Debtor's Plan Confirmation Memorandum, Docket No. 419 at 20). The Debtor presented no evidence that either of the Morris wives was active in the Debtor's business.

Ken Morris testified that in order to make the plan succeed he would need to devote a significant amount of his time to the plan. (Hr'g. Digit. Audio, July 19, 2021, at 1:38:15-1:39:30). He testified that he was essential for the plan's success and that the injunction was necessary because it would allow the Morris brothers to focus their efforts on running the business for the next four years rather than defending suits brought against them individually. He testified that he had spent substantial amounts litigating with Jacobs and Baughman and that he would not be able to afford continued litigation expenses. He did admit that the settlement he had reached with Jacobs and Baughman would alleviate that financial expense. Kurt also testified that his arbitration and the negotiated payments required by the Forebearance Agreement with Swift had put a financial strain on him. Both testified that the success of the plan depended on their participation. While there was proof that the Morrises were training a new manager to assist as the business grew, that employee was not yet ready. There was no evidence presented by any other party that they could

10

be easily replaced with other managers. For these reasons the court finds that Ken and Kurt are essential to the operation of the Debtor.

### F. Creditor Class Acceptance

The Debtor filed an amended summary of ballots on July 17, 2021. (Docket No. 442). Truist, the sole creditor in Class 1 with a claim of $1,530,362.73, rejected the treatment proposed for its secured claim, but withdrew its rejection and its objection at the confirmation hearing. First Citizens National Bank, as the sole creditor in Class 2, holding a claim in the amount of $193,487.50, accepted the plan. The City of Chattanooga, the creditor in Classes 3 and 4 and the Hamilton County Trustee, the creditor in Classes 5 and 6 were both designated as unimpaired and did not vote. Robert Gustafson, the sole creditor in Class 7, was designated as unimpaired and did not submit a ballot.

Class 8 is composed of the general unsecured creditors holding claims in excess of $2,500. The total dollar amount of votes submitted was $1,345,686.27. Eighty-nine percent of that amount accepted. Twenty-two out of twenty-six creditors voted in favor of the plan, which equals an eighty-five percent in number acceptance rate. (Docket No. 442). Class 9 was de minimis unsecured claims and no votes were cast in that class. Class 10, who General Unsecured Insider Claims, consisted of only Denia Morris, the former spouse of Ken Morris, who accepted the plan. Class 11, composed of the equity interest holders Ken and Kurt Morris, accepted the plan. (Docket No. 442). The court finds that the Debtor has met the requirement that each impaired class has accepted the plan. 11 U.S.C. § 1129(a)(7)(a)(i). To the extent that a class cast no votes, the court finds that each class will receive under the plan on account of its claim an interest in property with a value in excess of what the claimant would receive in a liquidation based on the liquidation

analysis provided with the Disclosure Statement.  (Disclosure Statement, Exhibit E. Docket No. 370-5).

### G. Objections

Six parties in interest filed objections to confirmation of the Debtor's plan – four individual creditors plus the United States Trustee and Official Unsecured Creditor's Committee ("Committee"). The first two are secured creditors Truist Bank and First Citizens Bank. Prior to the confirmation hearing, First Citizens filed a Motion for Permission to Change its Ballot Rejecting the Debtor's Chapter 11 Plan to an Acceptance of the Chapter 11 Plan, which was heard on July 15, 2021. (Docket No. 402). The court granted the motion, and First Citizens did not pursue its objection at the hearing based on its stipulated treatment described in the motion to change its vote. (Docket No. 441). On the morning of the hearing, July 19, 2021, Truist withdrew its objections to the plan based on the proposed interest rate for its claim and the injunctions. It also withdrew its rejection of the plan and did not cast a vote. The Debtor and Truist's stipulations regarding Truist's treatment under the plan were read into the record.

 The third objector is a couple who are treated as one party. Jacobs and Baughman were scheduled by the Debtor as creditors who are owed nothing. Jacobs and Baughman have maintained through the case that they contracted with another entity owned by the Morris brothers, Scenic City Investments, LLC (SCI), for the construction of a home which was never completed. The court received extensive proof regarding the relationship between SCI and K3D in the hearing on the Debtor's motion to substantively consolidate the two entities. The court ultimately denied the motion to consolidate the two companies. (Docket No. 266).  On the morning of the confirmation hearing, Jacobs and Baughman announced that they had reached a settlement with the Debtor which would provide them with an allowed claim in the case of

$50,000 provided they would admit that they were creditors of the Debtor. In the course of his testimony, Ken Morris testified that their agreement also included a nondisclosure agreement regarding his personal liability for the obligation. No information was provided regarding whether SCI would continue to be liable. The parties told the court that they did not believe a Rule 9019 Compromise would be necessary. The counsel for the Committee also represented to the court that the Committee was aware that the settlement would add $50,000 to the total amount of unsecured claims. The Committee did not oppose the terms of the resolution of the Jacobs and Baughman objection.

The fourth objecting creditor is Swift Financial, LLC (Swift), an unsecured creditor. Swift's claim arises from a Business Loan Agreement executed on May 16, 2019, by K3D and guaranteed by Kurt Morris. (Stipulated Facts, Docket No. 447). Kurt Morris acknowledged a default and consented to entry of an arbitration award in the amount of $76,095 on January 11, 2021. He also entered into a forbearance agreement to pay the debt in installments and to extend the one-year statute of limitations to confirm the award in a state court. (*Id.*). Swift objected specifically to Section 10.05 of the Amended Plan on the basis that the temporary third-party injunction is not appropriate because it is inconsistent with the provisions of chapter 11. 11 U.S.C. § 1123(b)(6). Swift also joined in the "Other objections filed to confirmation of the plan to the extent that they were not inconsistent." (Swift Objection, Docket No. 407 at 3). Swift's objection remains pending.

The Committee objected for a number of reasons, most of which focused on the Morrises' commitment to staying with the company and its ability to make the payments. After obtaining satisfactory answers to its concerns in the testimony of Ken and Kurt Morris at the

confirmation hearing, the Committee announced in its closing argument that it supported
confirmation and the inclusion of the injunction as a provision in the plan.

The U.S. Trustee objected to the original plan on three grounds, all of which related to
the injunction provision of Article 10. (Docket No. 401). Relying on the Sixth Circuit standards
expressed in *Dow Corning*, 280 F. 3d at 765, the trustee objected that an injunction that would
bar non-creditors, namely Jacobs and Baughman, from pursuing claims against non-debtors, such
as Ken Morris and SCI, was not fair or equitable and potentially exceeded the court's
jurisdiction. The settlements reached the day of the hearing with Jacobs and Baughman, and with
two other parties who had argued that they were not creditors of the Debtor, helped resolve the
U.S. Trustee's concern that the "non-creditors" would be involuntarily enjoined by the provision.
The Debtor also addressed giving notice to parties who had not originally been listed in the
matrix as creditors. The provision that included parties who could "potentially" be creditors was
deleted. That deletion further addressed the U.S. Trustee's due process concerns. Second, the
U.S. Trustee objected that a six-year injunction was effectively a permanent injunction. That
concern was mitigated by reducing the duration of the injunction from six to four years and
allowing the applicable statutes of limitations to be tolled. The U.S. Trustee objects now only on
the general grounds that such an injunction should be used sparingly, and this case is not the
unusual case where a third-party injunction is appropriate. The trustee recognized that the Sixth
Circuit Court of Appeals had not addressed the *Dow Corning* factors in the context of a
temporary, post-confirmation injunction.

### III.    Analysis

### A.  Introduction

Chapter 11 provides that a plan shall and may contain various provisions that restructure the Debtor's obligations to its creditors. 11 U.S.C. § 1123(a) and (b). Creditors may vote to accept or reject those proposed changes to the terms of those obligations. 11 U.S.C. § 1122. In addition, creditors may object to the confirmation of the plan if the Debtor's proposed treatment of those obligations does not meet the requirements of 11 U.S.C. § 1129. The burden is on the Debtor to show that it has met those requirements and has gained the required level of support from its creditors if its plan is to be confirmed. If it meets the other requirements but cannot garner the required level of support, then chapter 11 provides a "cram down process" through which the Debtor can demonstrate that its plan is fair and equitable in its treatment of the objecting creditor despite the creditor's opposition. 11 U.S.C. § 1129(b)(2)(B)(i).

### B.  The Requirements for Confirmation the Debtor Has Met

The Debtor has cleared the hurdles of section 1129 except for those that are implicated by the temporary post-confirmation, third-party injunction. K3D has complied with the applicable provisions of the bankruptcy code as a debtor in possession, is a proponent of a plan, and is proceeding in good faith. The payments made or to be made by K3D under the plan have been approved by the court or are subject to court approval. K3D has disclosed the identity of any insider that will be employed by the reorganized Debtor and the nature of any compensation to be paid to that insider. Each holder of an impaired claim has accepted the plan or will receive payments in an amount that is not less than the creditor would have received under a liquidation. The Debtor has made provision to pay the administrative claims in the case from cash it projects it will have

on hand at confirmation. Its plan has been accepted by more than one impaired class, including the strong support of the unsecured creditors.

As to its ability to complete the plan and avoid the need for further reorganization, the Debtor provided financial statements that reflected the improvement in net operating income over the course of the case from December 2019 through March 2021. (Trial Exhibit A2, Docket No. 438-1 at 5-13). At the end of that period, the Profit and Loss Statement reflected cumulative net operating income of $26,807. *Id.* at 13. At confirmation, the Debtor expected to have a balance on hand of $230,000 from operations, $104,000 from an Economic Disaster Injury Loan, plus the $100,000 contribution from the Morrises. (Disclosure Statement, Docket No. 370 at 26).

At the hearing, the Debtor also provided projections which showed gross revenue during the first year after confirmation of $1,875,000 compared with the Debtor's prior twelve months performance of $2,611,529 in gross revenue for the period April 2020 to March 2021. (Trial Exhibit J, Docket No 438-1 at 197). The Debtor's Gross Margin for April 2021 through March 2022 was projected to be $729,00 compared to $942,577 reported for the prior 12 months. (Docket 438-1 at 202). The Debtor projected expenses to be about $115,017 less in year one of the Plan than the preceding year (*Id.* at 211).  Ken Morris testified that the months which reflected lower sales are generally December through February with business picking up in March. (Hr'g. Digit. Audio, July 19, 2021, at 3:27:15-3:33:20). The Debtor's projections appear to be conservative based on the past years' performance. The monthly operating reports for April and May reflect that the Debtor had revenue of approximately $130,200 and $270,000 respectively, exceeding the $340,000 projected for the two months. The cost of goods sold and operating expenses were higher

than projected for these two months.[1] (Docket Nos. 412 at 51 and 413 at 53). Nevertheless, the company was showing net positive income for April and May. No party challenged the projected cash position or projections, although there was some concern expressed even by the Debtor about whether the commercial remodeling business would remain as strong. (Disclosure Statement, Docket No. 370 at 9). Based on the projections and the monthly operating reports, the court finds that the Debtor carried its burden with respect to showing that confirmation of a plan would not likely be followed by liquidation or the need for further reorganization of the Debtor.

### C.  The Objectionable Injunction

The sole remaining hurdle to clear for confirmation is for this court to find that the temporary, post-confirmation, third-party injunction contained in the plan is an appropriate provision in this case. 11 U.S.C. § 1126(b)(6). Article 10.05(c) of the plan seeks to enjoin creditors, parties-in-interest, or third parties from pursuing their collection rights against the officers, directors, shareholders, guarantors, or coborrowers of the Debtor, specifically the Morris brothers and their spouses, referred to as the "injunction beneficiaries." While a debtor may use its plan to modify its obligations to its creditors within the requirements of chapter 11, neither §§ 1122, 1123, nor 1129 expressly provide that a debtor may use its plan to modify or discharge the obligations owed by "injunction beneficiaries" to those same creditors. Section 523(e) states that "[e]xcept as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for such debt." 11 U.S.C. §542(e).

---

[1] Monthly operating reports for June and July were not filed until October 1, 2021well after the confirmation hearing. (Docket Nos. 463 and 464). They show revenues of $298,000 and $173,00 with gross profits in excess of projections; however, operating expenses were substantially higher. (Docket Nos. 463 at 48 and 464 at 45).

Unlike chapter 12 or 13, there are no statutory protections for co-obligors in chapter 11 either during the case or after confirmation. *Compare* 11 U.S.C. § 1201 *with* § 1301.[2]

One circuit has found that § 524(e) provides a basis for prohibiting any third-party injunction. Under its reasoning, such a provision violates applicable law and, therefore, makes a plan containing such an injunction unconfirmable. *See In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610, 616 (B.A.P. 9th Cir. 1990). (Although the injunction did not release the co-obligors, it did "affect[] the liability of the co-debtors" and did not comply with 524(e)). The Ninth Circuit was one of the first circuits to analyze the issue of post-confirmation injunctions. *See American Hardwoods, Inc. v. Deutch Credit Corp.* (*In re American Hardwoods, Inc.*), 885 F.2d 621 (9th Cir. 1989). That case found that the permanent injunction requested by the debtor in that case "[fell] squarely within the definition of a discharge under Section 524(a)(2)." *Id.* at 626. Extending that "discharge" to third parties violated the specific provision of section 524(e). *Id.* For a comprehensive review of the development of the case law discussing whether section 524(e) can be the basis disallowing third-party injunctions, *See* Judge Drain's discussion in *In re Purdue Pharma, L.P.*, __ B.R. ___, 2021 Bankr. LEXIS 2555, 2021 WL 4240974, at *41 (Bankr. S.D. N.Y. Sept. 17, 2021). Judge Drain concludes that reading section 524(e)'s language as the basis for preclusion of third-party injunctions has been "effectively refuted." *Id.* at 119 (citing *In re Airadigm Communs.*, 519 F.3d 640, 656 (7th Cir. 2008) (discussing legislative history of section 524(e))). He also cites the Sixth Circuit's rejection of that argument and its interpretation that section 524(e) "explains the effect of a debtor's discharge. It does not prohibit the release of a non-debtor." *Id.* at 120 (citing *Dow Corning*, 280 F. 3d at 657).

---

[2] The only injunction specifically sanctioned in chapter 11 is for creditors being paid through a trust. *See* 11 U.S.C. § 524(g)and (h).

### D. Use of Section 105 to Accomplish Goals of Reorganization / Sixth Circuit Limits on Permanent Injunctions

As noted above, the Sixth Circuit Court of Appeals has not gone so far as the Ninth Circuit to prohibit courts from approving third-party releases or permanent injunctions in plans of reorganization. The Sixth Circuit, notes in *Dow Corning*, that while there is no express authority for releases and injunctions, there is no explicit prohibition. *See Dow Corning*, 280 F.3d at 656. It further noted that "bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships." *Id*. (internal quotation marks and citation omitted). The court's broad authority derives from 11 U.S.C. § 105(a) which allows a bankruptcy court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

Further, the Court of Appeals noted that the bankruptcy code allows bankruptcy courts considerable discretion to approve plans of reorganization whose provisions are "not inconsistent with any applicable provisions of [Title 11]." *Dow Corning*, 280 F.3d at 656 (citation omitted). The plan at issue in *Dow Corning* attempted to resolve complex mass tort litigation involving the company's silicone breast implant product. The plan channeled thousands of plaintiffs involved in multidistrict tort litigation into either a Settlement or Litigation Facility, both of which were funded with $2.35 billion in contributions from insurers and the debtor's shareholders and from the debtor's cash reserves. In exchange for their contribution, the shareholders were released from tort claims; and the claimants were enjoined from pursuing the shareholders outside of the plan's Settlement or Litigation Facilities. In that context, the court found that, where a plan provides for payment in full of all claims against the non-debtor, "enjoining claims against a non-debtor so as not to defeat reorganization is consistent with the bankruptcy court's primary function." *Id*.

19

To reach that conclusion, the court discussed the doctrine of marshalling as a basis for the use of equitable powers in approving such an injunction. Citing *In re A.H. Robins Co.*, 880 F.2d 694, 701 (4th Cir. 1989), the court noted that the bankruptcy court has the power to order a creditor who has two funds to satisfy his debt to resort to the fund that will not defeat the other creditors. "[I]t is an ancient but very much alive doctrine that a creditor has no right to choose which of two funds will pay his claim." *Dow Corning*, 280 F.3d at 656 (citing *In re A.H. Robins*, 880 F.2d at 701). (internal editorial marks omitted).

The Court of Appeals concluded in *Dow Corning* that "enjoining a non-consenting creditor's claim against a non-debtor is not inconsistent with the Code" but then clarified under what circumstances such an injunction would be "appropriate." *Id.* at 658. It described such an injunction as a "dramatic measure to be used cautiously" and only in "unusual circumstances." *Id.* Allowance of releases and injunctions under a plan are authorized "in appropriate, narrow circumstances" in a majority of circuits. *In re Purdue Pharmacy*, 2021 Bankr. LEXIS 2555, 2021 WL 4240974, at *118 (collecting circuit court cases authorizing plan injunctions).

### E. Sixth Circuit Factors for Post-Confirmation Injunctions Against Non-Consenting Creditors

The Sixth Circuit set its parameters for consideration of authorization of an injunction in *Dow Corning*. The Court of Appeals listed seven factors to consider when determining whether an injunction is an appropriate provision.

> [W]hen the following seven factors are present, the bankruptcy court may enjoin a non-consenting creditor's claims against a non-debtor: (1) There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) The non-debtor has contributed substantial assets to the reorganization; (3) The injunction is essential to reorganization, namely, the reorganization hinges on the debtor

20

> being free from indirect suits against parties who would have
> indemnity or contribution claims against the debtor; (4) The
> impacted class, or classes, has overwhelmingly voted to accept the
> plan; (5) The plan provides a mechanism to pay for all, or
> substantially all, of the class or classes affected by the injunction;
> (6) The plan provides an opportunity for those claimants who choose
> not to settle to recover in full and; (7) The bankruptcy court made a
> record of specific factual findings that support its conclusions.

*Dow Corning.* 280 F.3d at 658. (citations omitted). The Debtor acknowledges that its plan does

not meet the fifth factor — its plan has no mechanism to pay all of the class of unsecured creditors.

The Debtor gets around this deficiency by arguing that *Dow Corning* is not the right test.

## F.  Argument for a Different Standard for a Temporary Injunction

The Debtor argues that the *Dow Corning* factors are not the correct ones to consider in this

plan. It asks the court to find that the factors to determine the appropriateness of a permanent post-

confirmation injunction are different than those for a temporary post-confirmation injunction. The

foundation of the Debtor's argument relies on cases which held that under section 105, the

automatic stay could be extended to third parties involved in formulating or funding a plan. *See In

re Lazarus Burman Assocs.*, 161 B.R. 891, 898 (Bankr. E.D.N.Y. 1993) (compiling pre-

confirmation cases in which the court entered injunctions protecting third parties).[3] Prior to

confirmation, a third-party injunction extends injunctive relief to nondebtor parties for the purpose

---

[3] In the case before the court, the Debtor has made repeated efforts to obtain such protections. *See K3D Property Services, LLC v. Fora Financial Advance, LLC*, No. 20-01003 (E.D. Tenn. filed Jan. 23, 2020); *K3D Property Services, LLC v. Red Rooster Welding*, No. 20-01004 (E.D. Tenn. filed Jan. 23, 2020); *K3D Property Services, LLC v. Acme Brick Tile & Stone, Inc.*, No. 20-01021 (E.D. Tenn. filed May 19, 2020); *K3D Property Services, LLC v. Jacobs et al*, No. 20-01029 (E.D. Tenn. filed June 23, 2020); *K3D Property Services, LLC v. Rollins et al*, No. 20-01041(E.D. Tenn. filed Aug. 24, 2020). In only one instance has the court granted that request, and in that case the creditor did not appear to oppose the motion. *See Jacobs et al*, No. 20-01029. In another instance, the court granted the injunction for only two months. *See Red Rooster Welding*, No. 20-01004. Each time the Debtor pled that the litigation would prevent the Debtor from moving forward to a plan. The Morris brothers have a number of businesses and are quite capable of keeping several entities operating and have been able to propose a plan for this company. In fact, the process of addressing confirmation objections has resulted in settlements with many of those same parties whose lawsuits against Ken Morris and other Morris entities were the Debtor's reason for needing the protection of an injunction.

of protecting the debtor while it develops a plan. The stay may be extended to preserve the orderly

conduct and integrity of the reorganization proceedings. *See id.* Another court described its

purpose as follows:

> The purpose of this section by its various subsections is to protect
> the debtor from an uncontrollable scramble for its assets in a number
> of uncoordinated proceedings in different courts, to preclude one
> creditor from pursuing a remedy to the disadvantage of other
> creditors, and to provide the debtor and its executives with a
> reasonable respite from protracted litigation, during which they may
> have an opportunity to formulate a plan of reorganization for the
> debtor.

*A.H. Robins Co. v. Piccinin*, 788 F.2d at 998 (*Matter of Holtkamp*, 669 F.2d 505, 508 (7th

Cir.1982)). It may be extended where the third-party actions "would interfere with, deplete or

adversely affect property of the [debtor's] estates or which would frustrate the statutory scheme

embodied in Chapter 11 or diminish [the debtor's] ability to formulate a plan of reorganization."

*In re Johns-Manville Corp.*, 33 B.R. 254, 263 (Bankr. S.D.N.Y 1983). It may be extended to

shareholders who are "required to devote substantial time and effort overseeing not only the day

to day affairs of the business, but the bankruptcy proceedings as well. ….[O]fficers must be free

at this stage to devote all their efforts to the operation of the business *and* the formulation of a

plan.." *In re MacDonald/Associates, Inc.*, 54 B.R. 865, 870 (Bankr. D. R.I. 1985) (emphasis in

original) (citation omitted).

The stay extension cases focus on getting the debtor to confirmation and preserving the

debtor's assets so that a plan can be formulated. Early in the case, the debtor need only show that

there is a likelihood that it can confirm a plan, that loss of its key participant at a critical time in

the reorganization may constitute irreparable harm to the estate or the reorganization effort, that

the stay will not cause more harm to the claimant than it provides benefit to the debtor, and that

the stay is supported by public policy. [4] The type of facts that support such an extension are similar to the facts that support the second and third *Dow Corning* factors — the contribution of the protected party and the reason that protection is essential to the reorganization.

This court is hesitant to accept the argument that the Sixth Circuit would abandon the *Dow Corning* factors applied at confirmation in favor of a standard resembling pre-confirmation injunctions. The circuit has been hesitant to even expand the benefits of the stay to third parties. In one of the early cases which discussed whether the automatic stay should be extended to third parties prior to confirmation, the Sixth Circuit denied extending the relief, finding no basis in law or equity to extend the debtor's stay to solvent codefendants in asbestos litigation. *See Lynch v. Johns-Manville Sales Corp.*, 710 F.2d 1194, 1199 (6th Cir. 1983). The court stated that "[i]t is universally acknowledged that an automatic stay of proceedings accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the chapter 11 debtor." *Id.* at 1196. The court reviewed the legislative history for authority:

> Nothing in the legislative history counsels that the automatic stay should be invoked in a manner which would advance the interests of some third party, such as the debtor's co-defendants, rather than the debtor or its creditors. This Court concurs with the district court's conclusion that it would distort congressional purpose to hold that a third party solvent co-defendant should be shielded against his creditors by a device intended for the protection of the insolvent debtor and creditors thereof.

*Id.* at 1197. (Citation omitted.)

---

[4] Debtor's memorandum in support of its request for an injunction extending the stay to the Morrises. (K3D Property Services, LLC v. Fora Financial Advance, LLC, No. 1:20-ap-01003, (E.D. Tenn. filed Jan. 23, 2020) Docket No. 3 at 19-24).

Nevertheless, the Debtor asks the court to distinguish *Dow Corning* as a mass tort case, and employ a test used in the Fifth Circuit for a smaller, closely held corporation. It also bases that request on differentiating a temporary plan injunction from a permanent one. Based solely on its shorter duration and the absence of a release, a temporary stay could be viewed as being more like the temporary stay extension than *Dow Corning's* permanent injunction accompanied by a release. If a temporary injunction is appropriate to assist the Debtor while it is formulating a plan, then the Debtor contends that a temporary injunction should be appropriate to assist the Debtor in performing that plan, especially if the duration is reasonable, the scope is narrow, and it is used "so as not to defeat reorganization." *Dow Corning*, 280 F.3d at 656. That appears to be the approach taken by the Fifth Circuit Court of Appeals in *Zale*, 62 F.3d 746, the case on which the Debtor relies heavily. "The impropriety of a permanent injunction does not necessarily extend to a temporary injunction of third-party actions. Such an injunction may be proper under unusual circumstances." *Id.* at 761.

While this language supports the Debtor's position, the temporary post-confirmation third-party injunction analysis in *Zale* is dicta. In *Zale*, the Fifth Circuit Court of Appeals did not approve a plan with such an injunction. In fact, it found that the bankruptcy court lacked jurisdiction over the enjoined parties' tort actions. It lacked power under section 105 to permanently enjoin contract actions held by the enjoined parties. Finally, the court found that even a temporary injunction would require an adversary proceeding under Fed. R. Bankr. P. 7001. *See id.* at 766. Nevertheless, the Fifth Circuit opened the door to the argument that a temporary third-party injunction could be an appropriate provision in a plan under "unusual circumstances," the same term used by the Sixth Circuit in its consideration of the permanent injunction in *Dow Corning*.

The *Zale* court even attributes the term to a Sixth Circuit case, *Patton v. Bearden*, 8 F.3d 343 (6th Cir. 1993) (discussing that a temporary injunction sought to protect non-debtors may be proper in "unusual circumstances"). In *Patton*, the phrase was used by the Sixth Circuit in its discussion of whether it could extend the stay imposed by section 362 to partners of a partnership in bankruptcy who were involved in litigation on account of their status as partners and who had signed the license agreement between licensor and the debtor. The court ultimately decided the injunction issue by concluding the partners would have to seek that relief first from the bankruptcy court by obtaining an injunction "after hearing and the establishment of unusual need to take this action to protect the administration of the bankruptcy estate," but not before discussing whether such an injunction could be issued at all in the case. *Id.* at 349. The court recognized that some courts have issued such injunctions in "unusual circumstances." The court found that the partners had not brought forth any evidence of circumstances that would justify such an injunction. *See id.* The partners argued that any proceeding against them would impair the debtor's right to compel contributions from the partners and thus interfere with the debtor's property. The court acknowledged two other cases where the partners' argument had been made and, in one, had even been successful. *See In re Litchfield Co. of South Carolina, L.P.*, 135 B.R. 797 (W.D.N.C. 1992) (extending the stay where partner promised to devote assets to the reorganization and entry of the judgments by creditors could render him insolvent); *In re Marley Orchards Income Fund I, Limited Partnership*, 120 B.R. 566 (Bankr. E.D. Wash. 1990) (declining to extend stay without proof that the partnership was insolvent). The *Patton* court found the partners had failed to show that judgments against the partners, if allowed to be taken, would render the partners insolvent or impair their ability to help with reorganizational efforts. Patton, 8 F.3 at 349.

The *Zale* court's reliance on *Patton* underscores that the Fifth Circuit was looking to the stay extension cases for authority to approve the injunction and what factors would make the provision appropriate. Reviewing that Sixth Circuit case underscores for this court that the Sixth Circuit is a demanding jurisdiction when it comes to using its equitable powers to impose a stay where the bankruptcy code does not expressly create one. In *Patton*, the Sixth Circuit attributed its requirement of "unusual circumstances" to *A.H. Robins*, 788 F.2d at 999, and *In re Kanawha Trace Dev. Partners*, 87 B.R. 892 (Bankr E.D. Va. 1988). The *A.H. Robins* court, in addressing an extension of the automatic stay prior to confirmation, described the unusual circumstances as follows:

> [I]n order for relief for such non-bankrupt defendants to be available under [362](a)(1), there must be "unusual circumstances" and certainly [s]omething more than the mere fact that one of the parties to the lawsuit has filed a Chapter 11 bankruptcy must be shown in order that proceedings be stayed against non-bankrupt parties. This "unusual situation," it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor. An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case. To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute.

*A.H. Robins*, 788 F.2d at 999 (internal quotation marks and citation omitted). Both *Robins* and later *Dow Corning* required a very close identity of interests to create unusual circumstances that would justify an injunction. Contractual indemnification meets that test, but there is no indemnification obligation that the injunction beneficiaries can point to in this case. Nevertheless, *Patton* seems to indicate that identity of interest may be based on something other than indemnification. *Patton,* albeit in dicta, recognizes that an injunction may be appropriate to protect the solvency of partners who are promising to devote assets to the reorganization. Even if the court

26

ultimately rejects *Zale* as the applicable test, *Patton* provides a basis on which Debtor can argue that it meets the first factor of *Dow Corning* without showing the existence of indemnification claims. Like the partners in *Patton*, Ken and Kurt Morris are the members of the Debtor. They are making contributions totaling $200,000 to the Debtor's reorganization. However, they also testified that their solvency is at risk if the lawsuits by creditors continue and that the litigation impairs their ability to help the reorganization.

As noted above, the *Zale* court relied on the pre-confirmation stay cases as the basis to find that a bankruptcy court might have power to enjoin actions by third parties against the debtor post-petition.  The *Zale* court elaborated on what it considered "unusual circumstances." *Zale*, 62 F.3d at 761. Such circumstances could be found "(1) when the nondebtor and the debtor enjoy such an identity of interests that the suit against the nondebtor is essentially a suit against the debtor, and (2) when the third-party action will have an adverse impact on the debtor's ability to accomplish the reorganization." *Id.* (citing *In re Drexel Burnham Lambert, Inc*, 960 F. 2d 285, 293).  Assuming the first requirement can be met, the second element provides the court with substantial discretion in determining the degree of "adverse impact" that must be present to justify the injunction. If unusual circumstances are found to exist, the courts following *Zale* then apply a standard injunction analysis in determining whether the temporary stay may be imposed:

> The four prerequisites to the issuance of such an injunction are: (1) a substantial likelihood that the movant will prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the threatened harm an injunction may cause to the party opposing the injunction; and (4) that the granting of the injunction will not disserve the public interest.

*In re Seatco Inc.*, 257 B.R. 469, 477 (Bankr. N.D. Texas 2001). The *Zale* test notably omits any express requirement for the debtor to pay the enjoined party in full or to provide an opportunity

27

for the enjoined party to recover in full elsewhere. Although *Zale* does not list the amount of payment as a factor, the dividend has been relevant to courts that have followed the *Zale* test.

### G. The Texas Temporary, Post-Confirmation Injunction Cases

The Debtor relies on two cases from the Northern District of Texas that have addressed post-confirmation injunctions, using the test suggested in *Zale* to determine if unusual circumstances exist and the injunction is appropriate. *See In re Bernhard Steiner Pianos USA, Inc.,* 292 B.R. 109 (Bankr. N.D. Tex. 2002); *see Seatco*, 257 B.R. 469. The court has found a third. *See In re Couture Hotel Corp.*, 536 B.R. 712 (Bankr. N.D. Tex. 2015).

In *Seatco*, the court found "unusual circumstances" in a case where the injunction beneficiary was the sole shareholder who had guaranteed the debt of the enjoined creditor. *Seatco*, 257 B.R. at 477. The court also found that the debtor met the first test by showing that a suit against the guarantor was essentially a suit against the debtor. It met the second test by showing that the principal was "vital" to a successful reorganization. *Id.* Although it is not part of the *Zale* test, this court notes that the *Seatco* court specifically addressed what was being paid to the objecting creditor through the plan and how the injunction affected the liability owed to the creditor. The injunction prevented collection of only 35% of the debt, which was the amount being paid under the plan. The creditor was "free to pursue [the injunction beneficiary] on the Guaranty for any amounts owing to it that are not being paid under the Plan …." *Id.* The Sixth Circuit might have referred to this as the mechanism to pay the creditor in full or an opt out had it been faced with this case. The injunction was narrow enough to protect the injunction beneficiary only to the extent that the debtor was paying the third-party under the plan.

In *In re Bernhard Steiner Pianos Inc.,* 292 B.R. 109, the court upheld a temporary injunction in favor of the principal of a piano sales company. It found that there was an identity of interests between the principal and the company because "the public identif[ied] the Debtor and [the principal] as one and the same." *Id.* at 113. The unusual circumstances test was met because "[t]he success or failure of the Debtor [lay] mainly, if not exclusively, with the efforts, reputation, and dedication of [the injunction beneficiary]." *Id.* at 117.  The injunction ended if there was a default. The court also found that the debtor had business reasons to pay the creditors as quickly as possible so that the duration of the injunction was likely to be as short as possible. Finally, as in *Seatco,* the court noted that the plan provided for payment in full. *See id.* at 118.

In *In re Couture Hotel Corp.*, the court addressed the confirmability of a plan that provided creditors would be temporarily enjoined from taking any action to prosecute their claims against any of the injunctive relief parties, so long as the plan was not in uncured default. *See Couture Hotel*, 536 B.R. at 749. Even though this debtor also proposed to pay creditors in full with interest, the court found that the debtor had failed to satisfy the *Zale* factors, *i.e.,* the debtor failed to show an identity of interests in the way that the debtors in *Seatco* and *Steiner Pianos* had. *See id.* at 736. The court found that ownership of the debtor coupled with a guaranty was not sufficient to satisfy the identity of interest discussed in *Zale*. *See id.* at 752 (citing *Zale*, 62 F.3d at 761). "Indeed, this type of overlap between shareholders and guarantors exists in a significant number of bankruptcy cases involving closely-held corporations. Granting an injunction on those grounds would make third party plan injunctions common place, which is the incorrect outcome under Fifth Circuit precedent." *Id.*

The injunction relief parties in *Couture Hotel* held and controlled 100 percent of the debtor's stock. Like the Morrisses in this case, they warned that, if their stock interests were

executed upon after a judgment was obtained by the creditors that held guaranties, then a transfer of ownership could jeopardize the franchises necessary for a successful reorganization. Finally, the debtor argued that a change in ownership could jeopardize the debtor's ability to use "valuable Net Operating Losses." *Id.* The court still found that the identity of interests to be lacking and concluded that the other arguments were "simply too attenuated to be grounds to grant a third-party plan injunction." *Id.*

These cases do not persuade the court that the Sixth Circuit's requirements are not workable or that its payment requirement is unreasonable in a smaller case. Therefore, the court will not reject the *Dow Corning* factors as the applicable test for a plan injunction, even if the injunction is temporary. The Sixth Circuit spoke clearly in its statement of what must be present to make an injunction appropriate for a plan. The length of such an injunction was not a factor. If a debtor pays the creditor in full, an injunction may be appropriate. As the Sixth Circuit noted in *Dow Corning*, the court may exercise its equitable powers to marshal assets and direct a creditor to recover from a specific fund. *See Dow Corning*, 280 F.3d at 656. This court finds the Sixth Circuit's equitable basis for delaying a creditor from pursuing its other sources of recovery persuades this court that substantial payment or an ability to seek recovery elsewhere is a critical piece of the analysis. Retaining this requirement also prevents abuse of the protection. The U.S. Trustee expressed concern that the use of post-confirmation injunctions provides the injunction beneficiaries with the protections of a bankruptcy without the need to file their own case and provide the disclosures that protect creditors who are stayed. Finding unusual circumstances only in cases which are providing very high returns to creditors will significantly reduce the number of cases that may even qualify for this relief post-confirmation and ensure that plan injunctions are authorized only in rare cases.

### H.  Developments in the Application of the *Dow Corning* Factors

While this court rejects the *Zale* test, it also recognizes that there have been other courts in the Sixth Circuit that have applied the *Dow Corning* factors with some modifications. With respect to the first factor, one court has determined that the identity of interests must include a finding that the protection given to the third party is limited to claims that are related to obligations of the debtors. *See In re FirstEnergy Sols. Corp.,* 606 B.R. 720, 740 (Bankr. N. D. Ohio 2019) ("To the extent that there is any flexibility in the requirement to analyze all of the *Dow Corning* factors, this first factor is the least negotiable because it polices the same boundary that other courts have analyzed as a jurisdictional issue."). The court has already noted its willingness to expand identity of interests from indemnification to other relationships which are clearly related to obligations of the debtor.

The court has found one case in which the payment requirement was not met. The applicability of the *Dow Corning* test to an injunction in a chapter 9 plan was addressed in *In re City of Detroit*, Michigan, 524 B.R. 147 (Bankr. E.D. Mich. 2014). The bankruptcy court faced confirmation objections from pensioners to a plan that provided a release of the State of Michigan and related entities who would have been responsible for payment of their pensions in exchange for a substantial settlement sum. The court in *City of Detroit* noted that "[s]ome courts, have tailored the seven *Dow Corning* elements to suit the needs of the case and have not required satisfaction of all seven factors," citing to a case from the Fourth Circuit. *Id.* at 174 (citing *Nat'l Heritage Found., Inc. v. Highbourne Found.*, No. 13-1608, 2014 WL 2900933, at 6 (4th Cir. June 27, 2014)). After finding the *Dow Corning* factors applied, the court addressed each of the factors. Its discussion adds some judicial gloss to the fifth and sixth factors. While there was a substantial contribution made by the State of Michigan for $194.8 million to satisfy the second factor, the

31

claims of the class affected were in excess of a billion dollars,[5] indicating that the pensions claims were not going to be paid in full. *See City of Detroit*, 524 B.R. at 175. Nevertheless, Judge Rhodes found that the "plan provides a mechanism to pay a substantial portion of the claims in the classes affected by the release …. Without these contributions, the impairment to these classes would have been much more significant." *Id.* (citation omitted). The actual language of the factor requires a mechanism "to pay for all, or substantially all, of the class or classes affected by the injunction." *Dow Corning* at 658. In *City of Detroit*, it appears this factor was interpreted as only requiring a "substantial payment." The approval of the injunction was one of the issues appealed following confirmation. On appeal, the Sixth Circuit never reached the issue of the whether this release and injunction were appropriate or whether the test was correctly applied. The appeal was dismissed for equitable mootness. *See Ochadleus v. City of Detroit* (*In re City of Detroit*), 838 F.3d at 799.

As for the sixth factor, the *Detroit* plan did not provide any opportunity for those claimants who chose not to settle to recover in full. The bankruptcy court concluded that it did not need to determine whether that element applied. Instead, it held that the other *Dow Corning* factors weigh so heavily in favor of approving the releases that it is appropriate to do so even if this element is not met." *Id.* at 175. This case therefore stands for the proposition that not all factors need to be met if some of the other factors can be weighted more heavily.

---

[5] The bankruptcy court estimated the total claims to be "potentially in the neighborhood of $3 billion." *In re City of Detroit*, 524 B.R. at 171-72. On appeal, the Sixth Circuit Court of Appeals noted that the pension plan was underfunded by $1.87 billion. This court cannot determine from the cases what percentage of the pensioners' claims was actually paid through the plan. The appellate decision indicates that the Detroit was anticipating a 27% reduction in the General Retirement System (GRS) pension when it filed the case, but with the settlement the reduction was 4.5%, plus the reduction or loss of other benefits. *Ochadleus v. City of Detroit* (*In re City of Detroit*), 838 F.3d 792, 798 (6th Cir. 2016).

## I.   Application of the *Dow Corning* Factors to this Case

Having determined that the *Dow Corning* factors should be applied, the court reviews the proposed injunction in this case.

### 1.   *Is this a case with unusual circumstances?*

In any case proposing a post-confirmation third-party injunction, the court must consider, as a general proposition, whether there are unusual circumstances that exist that justify granting such relief. As to that question, the court finds the Texas cases helpful. The courts there found unusual circumstances in small businesses. Ken and Kurt Morris share certain similarities to the injunction beneficiaries in *Seatco* and *Steiner Pianos*. Ken Morris testified that he was the face of the business with the restocking customers. The debtor is a closely held corporation whose reorganization depends on their active participation. The Committee's objection to the plan was resolved by confirming that the Morris brothers were committed to stay for the duration of the plan. To the Committee, this was a critical factor in making the plan feasible. The change in the Committee's position from opposition to support of confirmation bolsters the Morris brothers' testimony that they are crucial to the reorganizational efforts, even if no creditor testified to that fact.

As a result of Swift Financial's objection, the *Couture Hotel* concern remains — can this case be distinguished from the usual chapter 11 case of a closely held corporation with owners and officers who have guaranteed the business' debt? The court is aware of the growing concern that third-party releases and injunctions are being approved without "considerable scrutiny" and that the court's equitable powers are being exercised in more than the "limited, rare cases." *In re Purdue Pharma L.P.*, 2021 Bankr. LEXIS 2555, 2021 WL 4240974, at *125, s*ee also In re*

*FirstEnergy Sols. Corp.*, 606 B.R. 720, 737-39 (Bankr. N. D. Ohio 2019) (discussing the increase in requests for third-party releases and the need for courts to be circumspect about the legality of the release and the fairness to the affected third parties). Nevertheless, the court does find that there are aspects of this case that differentiate it from a typical, closely held business.

The Debtor was part of a morass of entities that the Morris brothers created. The structure became so cumbersome that accounting became muddled. Bookkeepers were fired or quit. Losing operations were closed too late. Intercompany transfers were legion and poorly accounted for. Parties with whom the Debtor or its affiliates did business were given contracts in the names of parties that the Morris brothers now contend were inaccurate. This web of entities has given rise to numerous disputes about who was a creditor of whom. The Debtor's reorganization has to a great extent been a simplification of these related operations to achieve transparency for its creditors and a clearer path forward for the owners to be able to perform under the plan. Confirmation of that plan would be the last step in allowing the Debtor to move forward.

Swift, the only remaining objecting creditor, did not put on any proof to the contrary. Swift in essence took the same view of the Morris brothers as Judge Houser did of the injunction beneficiaries in *Couture Hotel*. It argued that the Morris brothers are just guarantors in the very "usual" circumstance of a small, closely held business where owners are regularly guarantors of their company's debt. As the court has noted above, the court finds the history of this debtor to be more complicated. This case needs a third-party injunction more than the average case to protect the performance of the plan from being derailed by suits which may be based on the confusion caused by the multiple Morris entities and trade names. Therefore, this court finds that the debtor's reorganization presents unusual circumstances in which the court may proceed to apply the factors and determine if this injunction is appropriate.

**2.**   *Does the Injunction Meet the* Dow Corning *test***?**

While the relationship of the debtor with the injunction parties is not a traditional indemnification, the court finds that there is an identity of interests between the Morris brothers and the Debtor. It reaches this conclusion based on the following facts. Ken Morris is the face of the business and is the key to the reorganization of this Debtor. Ken Morris testified that litigation with creditors based on their guaranties will take time, energy, and "mind space." They both testified that continued defense would use personal and financial resources that they may need based on their current financial conditions to ensure that they can make the reorganization successful. They intend to save the funds necessary to make the month 44 contribution from their salaries. They argue that litigation expenses could drive them to filing their own chapter 7 cases and jeopardize the additional contribution. The court heard no evidence to the contradict their self-analysis of their mental and financial condition. The court recognizes that the distraction that litigation may cause the officers and the potential for a reduced balance sheet is a much less direct connection than indemnity claims or claims competing for the debtor's insurance fund. Nevertheless, broadening the interpretation of "identity of interests" to include a consideration of that connection would be consistent with the Sixth Circuit's discussion of when an injunction might be appropriate in a closely held chapter 11. To a lesser extent, it can also be said of Kurt Morris. The importance of a connection between the owner's efforts and prospects for a successful reorganization has been acknowledge by the Sixth Circuit in *Patton*, discussed above. It also makes the *Dow Corning* factors more easily applied in a smaller case.

The court does not find an identity of interests between the Debtor and the Morris brothers' spouses. They are not part of the day-to-day operations of the business. They are not owners or

officers. They did not testify that they had incurred any time or expense defending claims or suits against them.

With respect to the second factor, the court finds that the two contributions of $100,000 is a substantial amount. While the court has some concern about how the calculation of substantial contribution may be impacted when the same contribution is also used to retain the equity interest in the Debtor, no creditor raised this issue, and the court has found no authority that the amount of the contribution should be reduced by any consideration received by the injunction beneficiary other than the protection of an injunction.

As to the third factor, the court finds the injunction for the Morris brothers is essential to the reorganization based on the proof presented at the confirmation hearing, although it is a close question because of the substantial settlements reached the morning of the confirmation hearing. Ken Morris testified that his ability to be able to accumulate his second contribution will be impaired and that the injunction is essential to the reorganization. If he must continue fighting off creditors, it may bankrupt him. Judgments could result in the loss of his ownership and result in a change of management. Although he was able to resolve several disputes prior to the confirmation hearing, there was no contradictory testimony, and the court will take him at his word. The Morris brothers both testified that the process of the plan has been both financially, physically, and emotionally draining. Throughout this case, they have sought additional stay protection for themselves and their other entities. The court denied this relief for various reasons, which are stated in its prior opinions; but based on the changes they have made to their business, the hours they have worked to reach this point, and their testimony at trial, the court finds that they are at a breaking point. Relief from the prospect of other suits while they work for the next four years is essential. Should Ken or Kurt Morris quit, the Committee is concerned that the reorganization will

36

stall, if not outright fail. The court therefore finds that the third factor is met as to Ken and Kurt Morris.

As to their spouses, Debtor has not carried its burden of proof that an injunction protecting the spouses is essential to the reorganization. The spouses are not involved in the Debtor's business. (Hr'g. Digit. Audio, July 19, 2021, at 1:27:38-1:29:36). Ken Morris testified that his wife owns the home he lives in and that she works outside the home as a source of secondary income. (Hr'g. Digit. Audio, July 19, 2021, at 3:25:07-3:25:13). The court did not hear any evidence regarding pending lawsuits against them that relates to the Debtor. They are guarantors of the Truist obligation which is also guaranteed by two other businesses of the Morrisses.

With respect to the fourth factor, the Debtor has the overwhelming support of the creditors who will be enjoined from pursuing the injunction beneficiaries. As noted above, there was only one objection to confirmation by a creditor, Swift, and that creditor represents only $73,586.08 of the total $3,144,000 of unsecured debt. (Schedule D/E, Docket No. 1). The voting, unsecured creditors accepted the plan both 85% in number and 89% in amount. (Amended Ballot Summary, Docket No. 442).

The fifth factor remains a problem. The plan does not provide a mechanism to pay all, or substantially all, of the classes affected by the injunction. It provides for a payment of only 20% to unsecured creditors. This case is distinguishable from *City of Detroit*, because the other factors do not weigh so heavily that the court can disregard this factor. The third factor is a close call and other factors have not been met with respect to the spouses.

Finally, the sixth factor is not met. The injunction is temporary and so technically the creditors who chose not to settle, or in this case the creditor who has objected, have the opportunity

to recover when the injunction terminates. There are numerous mechanisms to terminate the injunction which may shorten the duration, such as a payment default, sale of equity, or one of the Morris brothers leaving the Debtor's employment; but as written, the injunction will delay a creditor for four years while risk of the loss of the injunction beneficiaries' assets continues. The opportunity to pursue the amount not paid through the plan should be available at confirmation, not four years later.

Because the *Dow Corning* factors have not been met, the injunction is not appropriate, and confirmation is denied. Given that only one creditor is not consenting to the injunction, the debtor may still be able to tailor the injunction to meet the factors or obtain the creditor's consent.  At the confirmation hearing, the debtor suggested that additional provisions could be added to the plan to protect any enjoined creditor's position from deteriorating during the injunction period.

### IV.    Conclusion

For the reasons stated above, the court will not deviate from the Sixth Circuit's guidance on the requirements for third-party injunctions outlined in *Dow Corning*. The court finds the form of the injunction is not appropriate because it fails to meet those requirements. Accordingly, confirmation is denied.

A separate order will enter.

# # #